402 So.2d 1296 (1981)
Ronald T. HOPWOOD and Milan M. Knor, Appellants,
v.
STATE of Florida DEPARTMENT OF ENVIRONMENTAL REGULATION, Appellee.
No. YY-256.
District Court of Appeal of Florida, First District.
August 13, 1981.
*1297 Thomas G. Pelham and Roger D. Schwenke of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for appellants.
Terry Cole, Gen. Counsel, and Segundo J. Fernandez and Charles G. Stephens, Asst. Gen. Counsel, Tallahassee, for appellee.
PER CURIAM.
Ronald T. Hopwood and Milan M. Knor (landowners) appeal from a final order of the Department of Environmental Regulation (DER) which directs that their permit application be denied. Landowners essentially argue that DER improperly rejected the DOAH hearing officer's recommended order that their permit application be granted in part. Upon the unique facts of this case, we agree with their contentions and reverse.
The landowners submitted to DER a dredge and fill permit application pursuant to Chapters 253 and 403, Florida Statutes, to complete construction of a perimeter canal around Big Pine Island in Lake Griffin, Lake County, Florida. In doing so, they proposed to deposit the resulting fill material on the island side of the perimeter canal below the ordinary high water elevation of Lake Griffin, to use turbidity curtains during the dredging process, and to install two culverts in the causeway connecting Pine Island to the mainland. In its appraisal report, DER felt that no environmentally acceptable modification was available. While it did endorse the landowners' proposal to place culverts under the causeway, it nevertheless gave notice of its intent to deny the application. The parties then proceeded to a Section 120.57(1) hearing before a DOAH hearing officer.
After considering the evidence and testimony presented by the two parties, the hearing officer made the following relevant findings of fact in her recommended order:
The construction of the causeway between the mainland and Big Pine Island in 1958 has prevented virtually any water from circulating between the marsh area and canal south of the causeway and the marsh area and canal north of the causeway. Due to this blockage of flow, lower dissolved oxygen levels and lower temperatures exist on the north side of the causeway. The south canal helps to maintain oxygen levels in the south marsh above concentrations considered critical to maintain aquatic life. The presence of the causeway has reduced the outflow of Lake Griffin by half, thereby increasing the residence time in the lake and promoting nutrient level build-up in the system. By increasing the waterflow through the marsh surrounding the island, the quality of water entering the Oklawaha River from eutrophic Lake Griffin should be greatly improved.
The marsh to the north of the causeway presently serves a vital purpose by removing nutrients and other deleterious substances from the water flowing from Lake Griffin into the Oklawaha River. The marsh community acts in a matter [sic] similar to the human kidney by filtering deleterious substances from the surface water.
Biological productivity of the north marsh area is directly proportional to the amount of flow. This area presently experiences water movement caused by the control of water elevations in the Oklawaha chain of lakes by a series of control structures. This "back-water" effect, which is caused by movement in the Oklawaha, is not a sheet flow. If a sheet flow could be created, the marsh area directly north of the causeway, which is severely distressed, could be improved.
A sheet flow northward could be created by the proper placement of adequate size culverts under the causeway and completion of the canal. The canal could facilitate the flow of water northward by *1298 permitting water to overflow the canal bank on the north side. This would be caused by the effects of a hydraulic gradient which exists between the water level in the canal and the ordinary mean high water level maintained by the St. John's River Water Management District. The hydraulic gradient would cause the canal to overflow its unobstructed north bank and travel northward through the marsh into the Oklawaha River. Water would be blocked by overflowing on the southeast side of the island because of the existing berm.
In order to restore circulation, it would also be necessary to construct a series of culverts evenly distributed under the causeway. The two-culvert system proposed by the Petitioners (landowners) would have a cosmetic effect and not significantly improve the natural water flow between the canals.
If the flow through the highly distressed marsh to the north of the causeway could be improved through the proper placement of culverts and construction of a perimeter canal, the positive aspects of the project would outweigh the negative impact of the elimination of approximately six (6) acres of productive marshland. If steps are not taken to reverse the continuing degradation of the marsh directly north of the causeway, a large and valuable area of wetlands will be lost. Artificial conditions already exist due to the finger canal on the north side of the causeway and the causeway itself.
The proposed filling of the island which is to occur below the 59.5-foot elevation (ordinary high water line) will reduce the river's flood storage capacity and the area capable of supporting plant and animal life. The private benefit of placing the spoil from the dredging project on the island below the 59.5-foot elevation is outweighed by the negative impact associated with the elimination of a significant amount of lowlying marshland. Adequate alternative means exist to provide fire protection to the residents of the island, and the filling of the outlying marshes on the island is not necessary to accomplish this purpose.
Petitioners have not been denied the use of their property either by the Department's denial of this permit or the granting of this permit with conditions. The existing lots are suitable for residential purposes, including that portion of the island below the 59.5-foot elevation which may be used for residential development by placing housing on pilings or poles.
Upon these findings of fact, the hearing officer in her conclusions of law recommended that the filling activity not be permitted. However, she also concluded that the public interest would be served by the proposed dredging [Section 253.123(3)(a), Florida Statutes] and that reasonable assurances had been provided that this activity would not result in violation of applicable water quality standards [Florida Administrative Code Rule 17-3] if certain conditions or modifications were made. Specifically, she recommended that the landowners install culverts or other similar structures of appropriate size to facilitate an adequate exchange of water between the canal on the north and south sides of the causeway, the number and size of the culverts or other structures to be determined by DER. She also recommended that the landowners be required to utilize equipment including, but not limited to, turbidity curtains to keep turbidity at a minimum during the dredging process.
DER accepted the hearing officer's findings of fact in toto but rejected her conclusion of law no. 6 with respect to the last two sentences (underscored):
The purpose of an administrative hearing is to formulate final agency action by considering the facts as reflected in the record, the law, and agency policy. In the instant case, the application as submitted does not meet the standards required for permitting as set forth by statute and regulation. This does not, however, mandate that the application be denied. Rather, the hearing process should be a vehicle for the formulation of final agency action which gives due consideration *1299 to appropriate modifications which could conform a project to the laws of the state.

Having rejected this particular conclusion of law, DER directed that the landowners' permit application be denied.
DER takes the position that the hearing officer exceeded her statutory authority under Chapter 120 in proposing modifications to the permit application to make it conform to applicable rules and regulations of DER. We recognize that major or substantial amendments to or modification of a permit application in midproceeding may well constitute a due process problem of notice to the agency. However, in view of the unique facts of this case, especially the hearing officer's numerous favorable findings of fact which were adopted in toto by DER, we are unable to conclude that the hearing office's suggested modifications regarding an enlargement of the proposed culvert system constitutes such a substantial deviation from the original permit application. Indeed, DER itself initially agreed that some degree of a culvert system be put into place. For it to now argue that the hearing officer's proposed modifications are beyond the parameters of the original permit application thus seems a bit ingenuous. Further, we take note that DER has previously granted permit applications subject to modifications recommended by a hearing officer. See, e.g., Long v. Okaloosa County, II F.A.L.R. 777-A (May 15, 1980); City of Tallahassee v. State of Florida, II F.A.L.R. 569-A (April 1, 1980); Sauls v. McAllister, II F.A.L.R. 430-A (March 7, 1980). In view of this agency practice, the numerous favorable findings that the permit application, if modified according to the hearing officer's proposals, would meet applicable state standards, and the relatively minor nature of these modifications, we conclude that DER's action in denying this application constituted an abuse of discretion. See Public Bank of St. Cloud v. State Department of Banking and Finance, 351 So.2d 73, 75 (Fla. 1st DCA 1977). Accordingly, we reverse the order and remand with directions that DER issue a permit subject to the hearing officer's recommended conditions: (1) that the landowners install culverts or other similar structures of appropriate size to facilitate an adequate exchange of water between the canals on the north and south sides of the causeway, the number and size of the culverts or other structures to be determined by DER; (2) that the fill or spoil resulting from the dredging of the canal not be placed on Big Pine Island or any surrounding property at any elevation below 59.5-feet in elevation; and (3) that the applicants utilize equipment including, but not limited to, turbidity curtains to keep turbidity at a minimum during the dredging process.
REVERSED AND REMANDED for further proceedings consistent with this opinion.
McCORD, LARRY G. SMITH and SHIVERS, JJ., concur.