580 So.2d 772 (1991)
The CONSERVANCY, INC. and Florida Audubon Society, Appellants,
v.
A. VERNON ALLEN BUILDER, INC. and State of Florida Department of Environmental Regulation, Appellees.
No. 90-520.
District Court of Appeal of Florida, First District.
March 29, 1991.
Rehearing Denied May 7, 1991.
*773 Joseph Z. Fleming, of Joseph Z. Fleming, P.A., Miami, for appellants.
Terry E. Lewis and Kevin S. Hennessy, of Messer, Vickers, Caparello, French, Madsen & Lewis, P.A., West Palm Beach, for appellee/A. Vernon Allen Builder, Inc.
Carol A. Forthman, Deputy General Counsel, for appellee/Florida Department of Environmental Regulation.
WIGGINTON, Judge.
The Conservancy, Inc. and Florida Audubon Society bring this appeal from the final order of the Department of Environmental Regulation granting a dredge and fill permit. Although we affirm a number of the issues raised on appeal, we must on one point reverse and remand for further proceedings.
In April 1988, appellee A. Vernon Allen Builder, Inc. (Builder) submitted its application to the Department of Environmental Regulation (DER or Department) for a dredge and fill permit. The permit application was for the excavation and re-disposition of approximately 1,155 cubic yards of material within Gordon Pass in order to imbed a sewage pipeline system along the bottom of Gordon Pass extending from the City of Naples mainland south to Keewaydin (Key) Island. The pipeline will be part of a sewage force-main system which will provide sewer service to present and future development on Key Island.
*774 Gordon Pass is located between the City of Naples and Key Island, a coastal barrier island designated by the United States Congress as a unit to be protected within the coastal barrier resource system pursuant to the provisions of the Coastal Barrier Resources Act (CBRA). The purposes of such congressional designation include prohibiting federal funding of any projects that would enable development on designated coastal barrier islands due to their importance to the estuarine system and public health and safety. Key Island forms the southern shore of Gordon Pass. As a coastal barrier island, Key Island enables the existence and functioning of the estuarine system to the west and serves as a buffer to wave action from the Gulf of Mexico. As numerous witnesses and experts confirmed before the hearing officer, Key Island is a dynamic, evolving and inseparable part of the estuarine system. In turn, the estuarine system is dependent upon and cannot be separated from Key Island for its existence.
The northern tip of Key Island is within the city limits of Naples and contains the Keewaydin Club, a vacation resort long ago developed for an existing small private club. Its existence is so limited that its impact was determined to be minimal by Congress so as to require that Key Island be designated as an undeveloped coastal barrier island entitled to protection pursuant to the CBRA. The proposed subaqueous sewage pipeline is intended to serve the club's existing facilities which presently utilize septic tanks, as well as a proposed new development of 75 exclusive estate homes intended to be built by Builder.
An appraisal was done by the DER local office leading to suggested modifications to the permit application. The modifications were ultimately incorporated into the design of the system and on August 31, 1988, DER issued a Notice of Intent to issue the dredge and fill permit. The permit imposes several conditions upon the construction and operation of the pipeline to ensure minimal disturbance of the area in compliance with Department rules. Further changes to the permit were proposed by the hearing officer in her recommended order and ultimately adopted by DER in the final order.
Appellants were granted a hearing to contest the intended agency action. Prior to the hearing, both Builder and DER persuaded the hearing officer, over appellants' objections, to exclude certain evidence during the hearing relating to the so-called "cumulative impact" that the project would have on Keewaydin Island. Appellants emphasized that Key Island, as a coastal barrier island, is inseparable from and necessary for protection of the national and state estuarine system. Further, they argued that the subaqueous pipeline for untreated sewage clearly enabled the proposed development on the island of 75 estate homes which, in turn, would produce cumulative impacts that would be environmentally devastating to the coastal barrier system.
The hearing officer rejected appellants' request to introduce most of the evidence regarding these cumulative impacts. However, certain evidence was received through the testimony of DER experts who had reviewed, in conjunction with the Department of Community Affairs, the comprehensive plan for the City of Naples, including the area in issue. In doing so, these experts also reviewed the proposed residential development on Key Island but testified that, in their opinion, because of the negative environmental impact of the development, the permit in issue enabling such development should be denied.
Appellants have raised four issues on appeal challenging DER's decision to grant the dredge and fill permit. We affirm Points I, III and IV with little comment other than to say that under the decisions in Hopwood v. Department of Environmental Regulation, 402 So.2d 1296 (Fla. 1st DCA 1981), and Manatee County v. Department of Environmental Regulation, 429 So.2d 360 (Fla. 1st DCA 1983), petition for rev. denied, 438 So.2d 833 (Fla. 1983), the complained of modifications to the project as suggested by the hearing officer and incorporated in the final order did not amount to a denial of due process. Instead, the more troublesome *775 issue involves the hearing officer's exclusion of the proffered evidence regarding the cumulative impacts of the permitted project. It is on this point that we must reverse and remand for further proceedings.
The issue of "cumulative impacts" was initially indirectly addressed in the Department's Notice of Intent, wherein the Builder was advised to make other permit applications before constructing the sewer pipelines if it felt that denial of the other permits would result in unnecessary expenditure of resources. Specifically, in paragraph 10 of the Notice, the Department made the following observations:
The Department is aware that the proposed subaqueous sewer force main is intended to service a planned seventy-five (75) unit single family development and that the completion of this development will include plans to expand an existing docking facility and construct bridges and boardwalks over jurisdictional wetlands. The applicant is advised that dredge and fill permits will be needed for such work as well as any other planned dredging or filling in jurisdictional wetlands. The Department's action in proposing to permit the construction of the force main shall not be construed as an endorsement or opinion of the permittability of any such additional projects and it is understood by the applicant that any such permit applications may be denied in full or in part. Given this, it is suggested that the applicant make such applications before constructing the force main if it is felt that the denial of these anticipated projects would result in the unnecessary expenditure of resources in constructing the force main.
Thereafter, the hearing officer ruled on the matter in regard to appellees' motion to strike appellants' amended petition. In a pre-hearing order, the hearing officer stated that when the Intent to Issue was filed, the Department was very much aware that the proposed subaqueous sewer main was intended to service a planned 75-unit single-family development. She also ruled that any effect this future planning might have on the design of the system as proposed by the Builder was an appropriate matter for consideration. However, any matters relating to the development beyond the design plans would have to be shown to be probative before they would be considered at the hearing. To that end, the order provided:
If it can be demonstrated that the sewer main line is currently designed for even more development beyond the proposed 75 units, this aspect of the design and how the design increase affects the review criteria will also be considered at the hearing. However, any extrapolation which predicts future harms from proposed development is irrelevant, and will not be considered as probative evidence during the formal hearing.
The issue was next addressed in the recommended order, under the heading "Preliminary Statement," where the hearing officer reviewed her earlier decision to limit the issues in the hearing to a review and consideration of the criteria for granting or denying permits set forth in section 403.918, Florida Statutes, as it related solely to the placement of the sewer pipelines. Specifically, the hearing officer stated:
Comprehensive planning issues, expected environmental harm from development of Key Island, and additional permit requirements for the operation of the imbedded pipe as a sewer force main were not considered probative or relevant in this permit review proceeding. The Petitioners' argument that the case of del Campo v. Department of Environmental Regulation, 452 So.2d 1004 (Fla. 1st DCA 1984), requires that future development of the island be addressed in these proceedings was rejected by the Hearing Officer... . This case is factually distinguishable from del Campo in that the portion of the island the pipeline seeks to serve is already developed. The "waste of resources" which concerned the court in del Campo is not present. It was represented by the applicant Builders in motion hearings and Responses to Requests for Admissions that the dredge and fill permit for the pipeline is sought *776 whether or not additional development occurs on Key Island.
In Chapter 403, Florida Statutes, the Legislature specifically set forth the criteria to be considered by DER in its review of an application for a dredge and fill permit. The statutes, the small size of the proposed project, and the representation by the applicant that the pipeline permit is not necessarily related to future development, required that the evidentiary and review limitations be imposed... .
Furthermore, in her conclusions of law, the hearing officer made the following additional observations on this point:
Of particular concern to the Petitioners at hearing was the indirect or secondary impacts from the proposed projects. In the context of this dredge and fill application, the secondary impacts would be any impact to DER jurisdictional waters not caused by the actual dredging and filling necessary to imbed the sewer pipeline. In this case, DER considered the project's secondary impacts by requiring the applicant to have emergency shut-off valves on each side of the pass to limit potential environmental harm from the use of the pipeline within a sewage transfer system. Sante Fe Lake Dweller's Association, Inc. v. Department of Environmental Regulation, 9 FALR 2603 (1987); Section 403.919, Florida Statutes. A total review of the proposed development in this proceeding is not allowed by the statutory grant of authority nor is it relevant. The petitioners' concerns regarding construction activities beyond this permit is not before the agency by way of any permit application and is therefore not ripe for DER review. DER has no power to require the applicant to submit all permits for review at one time. See, Caloosa Property Owners' Association, Inc. v. Department of Environmental Regulation, 462 So.2d 523 (Fla. 1st DCA 1985).
... It is contended that once the agency determined that it would not be impossible to develop this island in an environmentally sound manner, the del Campo requirements were met. The interpretation of del Campo suggested is rejected in that it places an unprecedented burden on an applicant which is beyond the statutory and rule criteria set forth by law... .
In refusing to disturb the hearing officer's ruling on this issue, the Secretary of DER rejected appellants' exceptions to the hearing officer's ruling on cumulative impacts. Distinguishing this case from del Campo, the Secretary observed the following:
In this case, however, Key Island is already partially developed and the proposed pipeline is designed to serve a planned additional 75-unit single-family development. The impact of this additional development was taken into consideration by the Department in its intent to issue, and the hearing officer did allow evidence to be introduced on the impact of the 75-unit single-family development.
He went on to conclude that the rule of del Campo:
Only requires the impact of future development to be considered where the likelihood of future development is highly probable given the economic waste of the permitted activity in the absence of such future development. Thus, in Caloosa Property Owners' Association v. Department of Environmental Regulation [citation omitted], the court held that the Department was not required to consider the impacts of future development where there was no evidence establishing a reasonable likelihood of prospective development in the same area... .
At the hearing in this case, expert testimony was introduced showing that the capacity of the pipeline was appropriate for the loading from the planned 75-unit development, but too small to handle the large additional development which Petitioners claimed would occur... . Therefore, there was competent, substantial evidence to support the Hearing Officer's conclusion that evidence of impacts of development beyond the planned 75-unit single-family development should be excluded because there was no reasonable *777 likelihood that the pipeline would be economic waste in the absence of such future development.
Contrary to the foregoing language in the final order, appellants strongly emphasize that their concern is not over speculative future development but, rather, focuses on the environmental impacts of the actually proposed 75-unit development. Consequently, they insist that this court's decision in del Campo v. Department of Environmental Regulation, 452 So.2d 1004 (Fla. 1st DCA 1984), is controlling and required the hearing officer to consider evidence of the impact of the development that unquestionably would be enabled and facilitated by the subaqueous pipeline. On the other hand, appellees Builder and DER urge that the cumulative impact analysis is limited strictly to an analysis of similar future permits in the same locale, where there is a reasonable likelihood of such similar applications.
Builder argues that in this instance, the record reveals that Key Island is already serviced by subaqueous crossings for water and electricity. Additionally, there is no evidence of any projects under construction in the area similar to that which is being applied for, i.e., the dredge and fill permit, or any applications for similar future projects. Builder maintains that section 403.919, Florida Statutes[1], codifies the Department's cumulative impact analysis but is limited to consideration of such similar projects.
On the other hand, appellee DER urges that appellants' argument is an attempt to expand the scope of both section 403.919 and previous cases dealing with the Department's examination of impacts that are generally classified as secondary or cumulative. DER explains that "secondary" impacts are those that may result from the permitted activity itself, and "cumulative" impacts are impacts that may result from the additive effects of many similar projects. It, in turn, contends that section 403.919 should be considered to refer to cumulative rather than secondary impacts. However, it does recognize that the distinction is blurred somewhat in cases such as the present one where at least some of the claimed impacts could be considered under either category, in that they include both additional dredge and fill projects (cumulative impacts) and projects or developments that may be facilitated by the installation of the pipe (secondary impacts). It also concedes that it has consistently applied the decisions in del Campo and Caloosa Property Owners' Association, Inc. v. Department of Environmental Regulation, 462 So.2d 523 (Fla. 1st DCA 1985), to its consideration of permitting decisions since the enactment of section 403.919 in 1984. However, DER maintains that in the present case, it did not deviate from either of the interpretations in those cases in its Intent to Issue.
DER points out that the Intent to Issue explicitly considered the fact that the pipeline could facilitate the development of the proposed 75 homesites but did not attempt to determine at that time all the specific impacts. Moreover, it explicitly advised Builder that developer permits were not assured by the pipeline permit and that expenditures depending upon such assurances should not be made. DER goes on to insist that the list of the impacts appellants want to include in the permit analysis go beyond any secondary effects of the pipeline itself and can only be considered speculative at this point. Thus, it concludes that the consideration of impacts was appropriately limited.
DER's arguments on this point illuminate the difficulties encountered by it and *778 the hearing officer "in attempting to maintain absolute conceptual separations of the permits while simultaneously recognizing that the outcome of each one inextricably influences the outcome of the others." J.T. McCormick v. City of Jacksonville, 12 FALR 960, 981 (Jan. 22, 1990). Thus, it becomes clear that the resolution of the issue involved herein is not limited strictly to analyzing the alleged cumulative impacts, but, rather, depends as well on a consideration of secondary impacts and the subtle tension that exists between the two analyses.
The cumulative impact doctrine was elucidated by the Department in Peebles v. State of Florida, Department of Environmental Regulation, 12 FALR 1961 (April 11, 1990). Therein, citing to section 403.919 and Caloosa Property Owners' Association, the Secretary of DER ruled that
[i]n order to snow [sic] entitlement to a dredge and fill permit, an applicant must show that he has provided reasonable assurance that water quality standards will not be violated and that the project is not contrary to the public interest, and both of those tests must take into consideration the cumulative impacts of similar projects which are existing, under construction, or reasonably expected in the future... . The applicant's burden of proof includes the burden of giving reasonable assurance that cumulative impacts do not cause a project to be contrary to the public interest or to violate water quality standards.
Id. at 1965-1966 (emphasis added). The Secretary went on to explain in Peebles that the role of the cumulative impact analysis is such that the Department is required to take into consideration "the cumulative impacts of similar projects which are existing, under construction, or reasonably expected in the future," citing again to the language in section 403.919. The Secretary emphasized that the cumulative impact doctrine "is not a third test, but rather a factor to be considered in determining whether reasonable assurance has been provided that the project will not result in violations of water quality standards and will not be contrary to the public interest." Id. at 1967. He went on to recount that the cumulative impact doctrine was originally developed as department policy and subsequently codified by the legislature in 1984 as section 403.919. The doctrine was also "approved" by this court in Caloosa Property Owners' Association. In explaining section 403.919, entitled "Equitable Distribution," the Secretary observed that, as the title suggests,
... the purpose of cumulative impact analysis is to distribute equitably that amount of dredging and filling activity which may be done without resulting in violations of water quality standards and without being contrary to the public interest. In order to determine whether the allocation to a particular applicant is equitable, the determination of the cumulative impact is based in part on the assumption that reasonably expected similar future applications will also be granted.
Id.
However, in addition to employing a cumulative impact analysis, it has been the Department's policy, for purposes of applying and balancing the statutory public interest criteria in section 403.918, to look "at the actual jurisdictional area to be dredged and filled, and any other relevant activities that are `very closely linked or causally related to the proposed dredging and filling.'" J.T. McCormick v. City of Jacksonville, 12 FALR at 980; see also Sante Fe Lake Dwellers Association, Inc. v. State of Florida, Department of Environmental Regulation, 9 FALR 2603, 2607 (May 31, 1987). Thus, in McCormick, the DER Secretary declined to adopt the hearing officer's recommendation not to consider any impacts of the overall landfill project in his review of the dredge and fill permit application to construct an access road to the project. Indeed, the Secretary observed:
Specifically in the context of permitting access roads and bridges, it has been the policy of the Department to consider what will be at the end of the bridge or road... . Of course, if the activities or impacts proposed at the end of the bridge or road are remote in distance or conceptual relationship from the dredge and fill activity, those activities or impacts *779 should be weighed accordingly in applying the statutory balancing test.
Id. at 981. This particular policy, which clearly employs the secondary impact analysis, was specifically countenanced by this court in del Campo.
Based on the foregoing, we do not consider unreasonable DER's position that the cumulative impact doctrine is codified in section 403.919, which requires the Department to take into consideration only those impacts created by the cumulative effects of similar future projects, and not the "secondary" impacts caused or enabled by the project, such as the development in the instant case. However, it is also clear from the Department's decision in McCormick that the Department in certain cases is willing to apply a secondary impact analysis and to consider the impact of the total development as enabled by the proposed dredge and fill permit, which consideration is essential to the Department's evaluating whether the applicant has provided the requisite "reasonable assurances" required by section 403.918. In fact, the statement of Department policy set forth in McCormick is clearly consistent with that set forth in del Campo wherein the Department conceded that it "`has maintained as a matter of law that in reviewing a permit application for a portion of a project it may consider the impacts of associated development, even where no application has been received for that development.'" 452 So.2d at 1006 (Smith, J., specially concurring and dissenting in part).
In the instant case, we disagree with appellees that the contemplated development of 75 estate homes is speculative and is not closely linked or causally related to the proposed dredging and filling. We perceive there to be little difference between the Department's aforestated need to "consider what will be at the end of the bridge or road," and the necessity here to consider what will be at the end of the pipeline, especially when the evidence, proffered or admitted, suggests that the development enabled by the dredge and fill permit could have devastating environmental impacts. Such evidence would be highly relevant to the Department's consideration of whether the applicant has carried its burden of giving reasonable assurances under section 403.918 that water quality standards will not be violated and the project is not contrary to the public interest.[2] Thus, the Department's consideration of the proposed development solely in relation to the design of the pipeline system itself neglected the necessity in this case to consider potential secondary impacts.
Consequently, it was error for the hearing officer to exclude the evidence proffered by appellants for the reasons set forth in her recommended order. Accordingly, this cause must be reversed and remanded for further proceedings and reevaluation of the proffered evidence in a manner consistent with this opinion.
SMITH, J., and WENTWORTH, Senior Judge, concur.
NOTES
[1] Section 403.919 is as follows:

Equitable distribution.  The department, in deciding whether to grant or deny a permit for an activity which will affect waters, shall consider:
(1) The impact of the project for which the permit is sought.
(2) The impact of projects which are existing or under construction or for which permits or jurisdictional determinations have been sought.
(3) The impact of projects which are under review, approved, or vested pursuant to s. 380.06, or other projects which may reasonably be expected to be located within the jurisdictional extent of waters, based upon land use restrictions and regulations.
[2] Recognizing that appellants have proffered a great deal of evidence in this regard, we are not by this opinion endorsing the admissibility of the proffers in toto. In this regard, McCormick reveals that

[i]n considering and evaluating impacts to upland resources that are closely linked or causally related to the proposed dredging and filling, the Department only considers impacts to significant resources  primarily archeological resource or listed wildlife species... . Within the category of listed wildlife species, the Department looks at and assigns weight to potential impacts to such species based on a hierarchy, with endangered species being the most important, followed by threatened species and then species of special concern... . The Department then considers and weighs the amount of use of the site by those species  for example, whether they nest there, whether they only use the site for feeding, or whether they are only intermittently seen on the site... .
.....
Finally, the purpose of these Department policies is to implement the express legislative mandate of Section 403.918(2), F.S., and to protect the significant resources of the state identified in the statute. Thus, the Department does not consider impacts to non-jurisdictional isolated wetlands where those impacts are taken into consideration in the permitting process of a Water Management District. .. . 12 FALR at 980-981.